WO

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Claudia Solien,                                        )
                                                       )    CV 07-456 TUC DCB
                            Plaintiff,                 )
                                                       )
v.                                                     )
                                                       )    **ORDER**
Raytheon Long Term Disability Plan #590;               )
Metropolitan Life Insurance Company,                   )
                                                       )
                            Defendants.                )
_____)

        The Court finds MetLife abused its discretion as Plan Administrator for the Raytheon Long Term Disability Plan when it found Plaintiff was not disabled as of April 18, 2005 and terminated her benefits.  The Court grants Plaintiff's Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.

Background

        Plaintiff filed this action under the Employee Retirement Income Security Act (ERISA) on September 13, 2007.  She alleges that Defendants improperly terminated her long term disability benefits as of April 18, 2005.

        Plaintiff began her employment with Raytheon on June 11, 1974.  Raytheon provided both short term disability (STD) and long term disability (LTD) insurance for its employees.  Defendant MetLife was both the insurer and the plan administrator for the STD benefit plan, but was not the insurer for the LTD benefit plan.  *See* (Defendants' Motion for Summary Judgment (Ds, MSJ), Statement of Facts (SOF) at 3, 10) (STD benefit plan funded through a group policy of insurance issued by MetLife; all benefits under the LTD plan are paid from plan participants' contributions held in Raytheon Employees' Disability Trust).

1  Plaintiff was diagnosed with depression in 2004, due to difficult family
2  circumstances, including her husband being terminally ill and her having custody of her
3  grandchildren.  Plaintiff sought and was granted disability benefits beginning after
4  October 24, 2004 through April 17, 2005.  Under the terms of the policy, Plaintiff's STD
5  benefits automatically converted into a claim for LTD benefits after 13 weeks.  (Ds MSJ
6  at 3-5, n.1.)  In other words, Plaintiff was "bridged" from the STD plan to the LTD plan
7  on January 20, 2005.  (Plaintiff's Memorandum Supporting Summary Judgment (P MSJ)
8  at 1.)

9  As explained in the Summary Plan Description for the LTD plan, the first 15
10  months of disability are based on a claimant's inability to perform the essential elements
11  of the employee's job with reasonable accommodation.  Thereafter, the claimant must
12  also be unable to work at *any* job for which the employee is reasonably qualified by
13  training, education or experience through the maximum age for receiving benefits.   (P
14  MSJ, SOF at 72.)

15  Plaintiff received benefits for approximately six months.  The relevant inquiry is
16  whether she could perform the essential elements of her job as an inspector in the missile
17  production department.  According to Raytheon's on-site physician, Dr. Haas, Plaintiff's
18  job required sustained ability to concentrate, ability to interact with her supervisor and co-
19  workers, ability to follow detailed drawings and refer to specifications, as well as to
20  identify possible flaws in the assembly before it went out the door.  (P MSJ, SOF at 59;
21  AR at 484.[1])   The physical level of exertion was "light."  (Ds MSJ, SOF at 47; AR at
22  168-172.)

23  ERISA: 29 U.S.C. § 1132(a)(1)(A)

24  ERISA authorizes plan participants, like the Plaintiff, to bring civil actions to
25  recover benefits due, to enforce rights conferred, or to clarify rights to future benefits

26

27

28
___
[1]Administrative Record at bates page number.

2

under the terms of the participant's plan.  29 U.S.C. § 1132(a)(1)(A), (B).  Plaintiff brings such an action to recover the value of her denied benefits and a declaration that she is entitled to ongoing Plan benefits.

An ERISA-regulated plan must be administered "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353 (9th Cir.1984), *quoting* 29 U.S.C. § 1104(a)(1)(D).  ERISA explicitly authorizes suits against fiduciaries and plan administrators to remedy statutory violations, including breaches of fiduciary duty and lack of compliance with plans. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) (deciding issues arising under Section 1132(a)(1)(B)).  The validity of a claim to benefits under an ERISA plan is reviewed under a *de novo* standard ***"unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id.*** at 115 (emphasis added).  If the Plan gives the administrator or fiduciary this discretionary authority, the courts review a denial of benefits for abuse of discretion. *Id.*

It is undisputed.  The Raytheon Plan gives MetLife, the plan administrator, the discretion to determine eligibility for benefits and to construe the terms of the plan.  (Ds MSJ, SOF at 10, 14, 15.)  The Court reviews MetLife's denial of benefits for an abuse of discretion.  In ERISA actions, when the standard of review is abuse of discretion, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Bendixen v. Standard Insur. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).  The parties proceed accordingly with cross motions for summary judgment.

1    Standard of Review: Abuse of Discretion

2         When reviewing for abuse of discretion, the Court does not substitute its own

3    judgment for that of the administrator.  The Court only sets aside the administrator's

4    decision if it is arbitrary and capricious.  The Court will uphold a decision that is

5    "grounded on *any* reasonable basis" and the administrator's factual finding that the

6    claimant is not disabled will be upheld unless it is "clearly erroneous."  *Jordan v.*

7    *Northrop Grumman Corporation Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2003)

8    (citing *Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1417 (9th Cir. 1991)

9    (emphasis in original); *Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480,

10   482 (9th Cir. 1990)).

11        Deferential review does not, however, mean no review.  *Jordan*, 370 F.3d at 879.

12   ERISA requires the plan administrator to give the specific reasons for denial of a claim,

13   written in a manner calculated to be understood by the participant, and it must "afford a

14   reasonable opportunity . . . for a full and fair review" of the adverse decision.  *Id.* (quoting

15   29 U.S.C. 1133(1), (2)).  "If the administrator's decision is arbitrary, as where the

16   administrator 'arbitrarily refuse[s] to credit a claimant's reliable evidence,' the

17   administrator's decision fails the 'fair review' requirement of the statute.  But as long as

18   the record demonstrates that there is a reasonable basis for concluding that the medical

19   condition was not disabling, the decision cannot be characterized as arbitrary, and we

20   must defer to the decision of the plan administrator."  *Id.* (citing *Black & Decker*

21   *Disability v. Nord*, 538 U.S. 822, 834 (2003), *Horan*, 947 F.2d at 1417).

22        In other words, an ERISA administrator abuses its discretion if it renders a

23   decision without explanation, construes provisions of the plan in a way that conflicts with

24   the plain language of the plan, or relies on clearly erroneous findings of fact.    *Boyd v.*

25   *Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).  A

26   plan administrator's findings of fact are not clearly erroneous "where there is substantial

27   evidence to support the decision, that is, where there is 'relevant evidence [that]

28                                              4

reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Snow v. Standard Insur. Co.*, 87 F.3d 327, 332 (9ᵗʰ Cir. 1996). The plan administrator may not, however, pick and choose between portions of the medical record or ignore parts and use only those parts of the record which are favorable to a finding of no disability. *See Spangler v. Lockheed Martin Energy Systems, Inc.,* 313 F.3d 356, 362 (6ᵗʰ Cir. 2002) (concluding the administrator "cherry-picked" files to obtain a favorable report); *cf., e.g., Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10ᵗʰ Cir. 2004) (in social security case, ALJ may not pick and choose from medical opinion, using only those parts favorable to denial of benefits); *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7ᵗʰ Cir. 1984) (Secretary may not use only portions favorable to her decision and ignore other parts of the record).

ERISA's deferential standard of review cannot be used to avoid detection and liability, as did "one particular insurer, Unum-Provident Corp, [to] boost[] its profits by repeatedly denying benefit claims it knew to be valid." *Saffon v. Wells Fargo & Company Long Term Disability Plan*, 522 F.3d 863, 867 (9ᵗʰ Cir. 2008) (citing John H. Langbein, Trust Law As Regulatory Law: the UNUM/Provident Scandal and Judicial Review of Benefit Denials Under ERISA, 101 NW. U.L.Rev. 1315, 1317-21 (2007) (describing Unum-Provident's behavior). Therefore, the courts must weigh a fiduciary's conflict of interest when determining whether there is an abuse of discretion. *Id.* at 868 (citing *Firestone*, 489 U.S. at 115); *accord, Metropolitan Life Insur. Comp. v. Glenn*, 128 S. Ct. 2343 (2008) (holding that a district court should consider a conflict of interest when assessing abuse of discretion). A fiduciary's "conflict of interest" is a "'factor in determining whether there is an abuse of discretion.'" *Saffron*, 522 F.3d at 868 (quoting *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)).

Consequently, "[t]hat the Plan grants MetLife discretionary authority is only the first step in determining the standard by which we review its denial of benefits." *Id.* The degree of deference to accord varies significantly, depending on whether or not MetLife

labored under a conflict of interest.  *Id.*  The Ninth Circuit recognizes that there is an "inherent conflict that exists when a plan administrator both administers the plan and funds it."  *Id.* (citing *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955, 966-67 (9th Cir. 2006) (en banc)).  "We 'weigh' such a conflict more or less 'heavily' depending on what other evidence is available"  *Id.* (quoting *Abatie*, 458 F.3d at 968).

"We 'view[ ]' the conflict with a 'low' 'level of skepticism' if there's no evidence 'of malice, of self-dealing, or of a parsimonious claims-granting history.'  But we may 'weigh' the conflict 'more heavily' if there's evidence that the administrator has given 'inconsistent reasons for denial,' has failed 'adequately to investigate a claim or ask the plaintiff for necessary evidence,' or has 'repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly.'"  *Id.* (quoting *Abatie* at 968).

The court in *Abatie* explained what it means to weigh a conflict of interest, as follows:

> [W]eighing a conflict of interest as a factor in abuse of discretion review requires a case-by-case [balancing].  ...  A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might.

*Abatie* 458 F.3d at 968.

This Court is familiar with the process of weighing conflicts of interest. "For example, in a bench trial the court must decide how much weight to give to a witness' testimony in the face of some evidence of bias."  *Saffon*, 522 F.3d at 869.  "What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records."  *Id.*  The Court considers the particulars of the conflict of interest, along with all the other facts and circumstances, to determine whether an abuse of discretion has occurred.  *Id.*

1    Under *Abatie,* when reviewing a discretionary denial of benefits by a plan

2  administrator who is subject to a conflict of interest, the Court must determine the extent

3  to which the conflict influenced the administrator's decision and discount to that extent

4  the deference we accord the administrator's decision. *Id.*  The Court does the same

5  regarding procedural irregularities, which like conflicts of interest, are also matters to be

6  weighed in deciding whether a plan administrator's decision was an abuse of discretion.

7  *Abatie*, 458 F.3d at 972.  When an administrator can show that it has engaged in an

8  "'ongoing, good faith exchange of information between the administrator and the

9  claimant,'" the court should give the administrator's decision broad deference

10 notwithstanding a minor irregularity.  *Id.* (citations omitted).  More serious procedural

11 irregularities may weigh more heavily.  *Id.* (citing  *Gatti v. Reliance Standard Life Insur.*

12 *Co.*, 415 F.3d 978, 985 (9th Cir. 2005) (explaining deference is eviscerated where

13 procedural violations are "so flagrant as to alter the substantive relationship between the

14 employer and employee, . . ..")

15    Here, there are no conflicts of interest in respect to the administration of Plaintiff's

16 LTD benefits, but Plaintiff alleges procedural errors.  Plaintiff submits that MetLife failed

17 to comply with ERISA's notice provisions.  "A plan 'shall provide to every claimant who

18 is denied a claim for benefits written notice setting forth in a manner calculated to be

19 understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific

20 reference to pertinent plan provisions on which the denial is based; (3) A description of

21 any additional material or information necessary for the claimant to perfect the claim and

22 an explanation of why such material or information is necessary, and (4) Appropriate

23 information as to the steps to be taken if the participant or beneficiary wishes to submit

24 his or her claim for review.'"  *United States v. Tinker*, 566 F. Supp. 2d 1158, 1163-64

25 (Calif. 2008) (citing 29 U.S.C. 1133(1); quoting 29 C.F.R. 2560.503-1(f)).

26    "Put simply, 'what this regulation calls for is a meaningful dialogue between

27 ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in

28

7

part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial.'" *Id.* (quoting *Booton v. Lockheed Medical Ben. Plan,* 110 F.3d 1461, 1463 (9th Cir.1997)).  The purpose of ERISA's notice requirement is to inform the claimant of what she must do to obtain benefits and enable her to effectively protest a plan's denial of benefits.  *Id.* (citing  *Boyd v. Aetna Life Ins. Co.,* 438 F.Supp.2d 1134, 1156 (C.D.Cal.2006); *Juliano v. Health Maint. Org. of New Jersey, Inc.,* 221 F.3d 279, 287 (2nd Cir.2000)).

The Plaintiff argues that MetLife denied her benefits because there was no "objective evidence," such as a mental status exam or psychological testing in her medical records to support her alleged functional limitations, but never gave her notice that such evidence was required to support her claim.  MetLife argues that she was not denied benefits because certain "magic documentation (i.e., a GAF[2] assessment) had not been provided."  (Ds Reply at 5.)  "Plaintiff's benefits were denied because the overall medical documentation provided did not reflect a functional impairment and continuing disability preventing her from returning to work."  *Id.*

Defendants argue that they did not consider a GAF assessment to be a critical and indispensable piece of information, while it may have been relevant, "the information MetLife considered critical and indispensable to Plaintiff's LTD claim was evidence of a current functional impairment and ***continuing*** disability that precluded Plaintiff from performing her job on an on-going basis after April 17, 2005." *Id.* at 5-6 (emphasis in original).

---

[2]A GAF rating provides a measure of a person's psychological, social, and occupational functioning. GAF provides an assessment for mental-health illness. Diagnostic and Statistical Manual of Mental Disorders at 20 (3rd ed. 1994).  It should be made for two time periods: current and past year.  *Id.*  The past year measurement should be for the highest level of functioning, whereas the current level of functioning would register the particular crisis being evaluated for treatment purposes.  *Id.*

he

MetLife's ERISA Notices:

On October 29, 2004, the Defendant denied the Plaintiff STD benefits because there was no clinical data to support her claim.  (Ds MSJ, SOF at Ex. 6: 10/29/04 Notice.) She appealed, and on December 28, 2004, the Defendant granted her STD benefits from October, 21, 2004 to December 22, 2004, because Plaintiffs' doctors reported that she was suffering from insomnia, secondary to sleep deprivation, confusion, fatigue with acute/chronic adjustment reaction – aggravating underlying migraine disease and fatigue, irritability, difficulty thinking and concentrating, memory disturbances and increased migraine headaches. *Id.* at Exs. 10, 11: 12/28/04 Notices.  To secure these benefits, Plaintiff had to provide adequate medical evidence of her functional limitations through December 22, 2004.

Plaintiff appealed the December termination date, and on February 15, 2005, the Defendant continued STD benefits to January 19, 2005, but denied them thereafter. MetLife told the Plaintiff that her records lacked sufficient evidence such as assessments of functional impairments or severe debilitating symptoms to support her claim beyond January 19, 2005, and there was no clinical data to support the existence of a condition rendering her disabled to perform her assembly technician job beyond January 19, 2005. To establish her continuation of disability to January 19, 2005, the Plaintiff had to provide adequate evidence of her functional limitations up through that date. *Id.* at Ex. 19:2/15/05 Notice.

Plaintiff appealed the January termination date, and on April 4, 2005, MetLife approved LTD benefits from January 20, 2005 to April 17, 2005, based on Plaintiff's treating physicians' confirmation that she had been diagnosed and was being treated for chronic migraine headaches and depression. *Id.* at Ex. 25:4/4/05 Notice.  Again, Plaintiff had to provide adequate evidence of functional limitations to support the continuation of disability to April 17, 2005.

Plaintiff appealed the April termination date, and on July 27, 2005, the Defendant denied LTD benefits beyond April 17, 2005, because there were "no mental status examination findings objectifying [sic] any difficulty with memory, cognition, or concentration," and her claim "continued to lack documentation noting any functional limitations, which prevented [her] from performing her job as of April 18, 2005." *Id.* at Ex. 41: 7/27/05 Notice.  She appealed, but MetLife continued to deny benefits as of April 18, 2005.  *Id.* at Ex. 42: 8/3/05 Notice and Ex. 45: 11/25/05 Notice.

The MetLife notices, which awarded Plaintiff disability benefits through December 22, 2004, January 19 and the April 17, 2005, respectively, informed the Plaintiff of the type of "medical information" she needed to provide for MetLife to continue her benefits, which included the following: "copies of all office notes and diagnostic testing []; copies of all rehabilitation or therapy notes and records (if applicable); names and dosages of all medications prescribed (if applicable); a current diagnosis and treatment plan; functional limitations and restrictions pertaining to your current medical condition; functional abilities; expected return to work date, and any complications or co-morbid conditions that impact the recovery period." *Id.* at Ex. 11: 12/28/04 Notice and Ex. 25: 4/4/05 Notice.

MetLife's July 27, 2005, notice that her records "continued" to lack documentation noting any functional limitations would have been confusing to any reasonable person. The reason given, "that there were no 'mental status examination findings objectifying'" any difficulties, was not reasonably clear language to explain to a lay person that she needed to compile clinical test results.  The Plaintiff would not have understood that she needed to provide information different from what she had previously been instructed to provide and had provided to establish her functional limitations to December and her continued functional limitations to January and April 17, 2005.

The description for coverage never changed.  "You are considered disabled if, due to a non-work-related illness or injury, you are: under the regular care and attendance of a doctor; and unable to perform all of the essential elements of your regular job with reasonable accommodation." *Id.,* Ex. 1: 2004 Benefits Handbook; AR at 6.   If the medical evidence never changed, it would necessarily establish her continued disability on or after April 18, 2007.  Any reasonable person would have understood MetLife's notices within this context.

The chronology of MetLife's claim decisions establishes that the only change was MetLife's evidentiary requirement for proving continued disability after April 17, 2005. MetLife is disingenuous when it asserts that it denied LTD benefits as of April 18, 2005 because the overall medical documentation the Plaintiff provided did not reflect a functional impairment and continuing disability, and <u>not</u> because of a documentation requirement.[3]  While MetLife's argument, like the July notice, is framed in terms of Plaintiff's need to establish a continuing disability, both are aimed at the type of evidence necessary to prove her functional impairments rather than to prove the continuation of such impairments.

In December and April, the Plaintiff was told what type of medical evidence was necessary to establish her continued disablity.  *Id.* at Ex. 11: 12/28/04 Notice and Ex. 25: 4/4/05 Notice.  The evidence described in these notices was the type submitted by the Plaintiff, such as her treating doctors' office notes, therapy notes and records, names and dosages of medications, current diagnosis and treatment plans, and her doctors' opinions regarding her functional limitations and abilities, and expected return to work dates.  This litany included one example of objective evidence, which was "diagnostic testing." The notices did not distinguish between, assess greater value to, or make this one piece of objective evidence imperative to establish disability.  Plaintiff presented, and MetLife

---

[3]*See* (Ds Reply at 2.)

Case 4:07-cv-00456-DCB   Document 41   Filed 12/17/08   Page 12 of 22

accepted through April 17, 2005, the medical records and opinions of her treating physicians regarding her functional limitations, without diagnostic testing. MetLife awarded her benefits through April 17, 2005, based on the same evidence it found to be inadequate in July. *Id.* at Ex. 41: 7/27/05 Notice.

Plaintiff appealed the April termination date, and on August 3, 2005, MetLife affirmed its denial of continued benefits. Again, MetLife referred to the clinical treatment records from Plaintiff's psychiatrist, Dr. Ronald David, which dated back to February 2005, and its peer-to-peer conference with him to discuss his diagnosis and assessments. MetLife recounted the discussion as follows: "Dr. David states that you had significantly decompensated under the stress of your husband's terminal illness and death, and under the pressure of trying to care for your grandchildren. Dr. David states in addition to the usual symptoms of severe grief and depression such as tearfulness, decreased energy and insomnia, you have become disorganized with significant deficits in concentration and memory. Dr. David further states that at this time you would not be able to perform your role as technician." *Id.* at Ex. 42: 8/3/05 Notice.

Contrary to its admission of the above detailed discussion with Dr. David, MetLife complained that the doctor did "not provide any additional medical evidence to review such as office notes, frequency of treatment, information on any treatment or medication changes, plans for any hospitalization or intensive out patient treatment." *Id.* MetLife wrote: "The medical data does not clearly support the severity of psychiatric conditions other than subjective self-reports." *Id.*

Dr. David provided MetLife with the same information he had previously provided, which had established Plaintiff's continued disability through April 17, 2005, but MetLife found such evidence was no longer adequate to establish continued functional limitations. The record makes it clear that MetLife wanted something more.

1  Plaintiff prevails on her argument that as of April 18, 2005, MetLife required her to

2  provide objective medical evidence of her disability.

3     The notice MetLife provided to the Plaintiff was inadequate to inform her that she

4  needed to provide "objective clinical evidence," defined as: "evidence consisting of

5  medical signs and laboratory findings.  Medical signs are anatomical, physiological, or

6  psychological abnormalities which can be observed apart from symptoms, and must be

7  shown by medically acceptable clinical diagnostic techniques.  Psychiatric signs are

8  medically demonstrable phenomena which indicate specific abnormalities of behavior,

9  affect, thought, memory, orientation, and contact with reality.  They must be shown by

10  observable facts that can be medically described and evaluated.  Laboratory findings are

11  anatomical, physiological, or psychological phenomena which can be shown by the use of

12  medically acceptable laboratory diagnostic techniques, some of which include chemical

13  tests, electrophysiological studies (e.g., electorcardio-grams, electroencephalograms),

14  roentgenological studies (x-rays), and psychological tests."  70C Am. Jur. 2nd Social

15  Security and Medicare § 2021 (2008).[4]

16     The Court finds that the MetLife notices failed to explain this evidentiary

17  requirement and instead mislead the Plaintiff to believe that her claim could be adequately

18  supported with "medical evidence," which includes "statements or reports from the

19  claimant, the claimant' treating or examining physician or psychologist, and others

20  regarding the claimant's medical history, diagnosis, prescribed treatment, daily activities,

21  efforts to work, and any other evidence showing how the claimant's impairments and any

22  related symptoms affect the claimant's ability to work."  *Id.*  This was the type of

23

24  ──────────────

25     [4]The Court notes that Plaintiff's medical records contained medically observable facts
26  because her doctors observed her crying, being unable to drive to and attend therapy sessions
27  alone, being confused regarding appointments, venting her grief, and jerky breathing due to
   anxiety attacks.  *See* (AR at 393-397: Dr. David's notes; AR at 484-488: Raytheon clinic
28  notes.)

13

evidence she was told to provide, did provide, and which established her functional limitations for continued disability through April 17, 2005.[5]

Not only did MetLife fail to explain the objective evidence requirement, it failed to notice the pertinent plan provisions upon which it based this evidentiary requirement[6] and failed to explain why such material or information was necessary. Without this instruction, the notices were not calculated to be understood by the Plaintiff.

The Court finds procedural irregularities in MetLife's compliance with ERISA's notice requirements and looks with a suspecting eye at MetLife's exercise of its discretion. The irregularities were not minor technicalities because they substantively influenced MetLife's decision to deny benefits as of April 18, 2005. Therefore, the Court will take a hard look at MetLife's reasons for denying coverage.

Denial of Disability Benefits

---

[5]The Court notes that medical evidence will in large part be based on a patient's reports to her physician. Where there is no evidence challenging the patient's credibility, medical opinions based on such self reporting are also credible. *See e.g., Fair v. Bowen,* (finding that an opinion of disability "premised to a large extent upon the claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted").

[6]The LTD Plan provided: "No Benefits shall be paid [if]. . . . [t]he participant fails to give the Claims Administrator adequate medical proof, upon request, that such Disability exists or continues to exist." (Ds MSJ, SOF, Ex. 1: LTD Plan, effective January 1, 1999; AR at 44.) The Plan Summary provided that the LTD Plan will not pay benefits . . . if you fail to provide satisfactory and objective medical proof that you are disabled. *Id.,* AR at 13. Where there are material differences between a summary plan document and the plan document, courts generally bind ERISA defendant to the more employee-favorable of the two. *Banuelos v. Constr. Laborers' Trust Fund*, 382 F.3d 897, 904 (9th Cir. 2004). *See Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 877-878 (9th Cir. 2003) (discussing impossibility of proving fibromyalgia with objective evidence, and plan may not require that which cannot exist, but may require objective findings to support functional limitations due to fibromyalgia). The MetLife plans are silent regarding evidentiary requirements for functional limitations as distinct from proving disability.

14

Initially, MetLife denied the Plaintiff's claim.  After she appealed, MetLife sent her file to an independent psychological consultant (IPC), John P. Shallcross, Psy. D., who reviewed it.  He reported that other than her doctors' certifications of disability there were no medical records submitted by the Plaintiff to support her claim.  He consulted with her family physician, Dr. Sylvia Rouzaud, and her therapist, Dr. Maureen Maxon. He concluded that the severity of her psychological impairment precluded her from performing the duties of her job because she was overwhelmed by the terminal illness of her husband and the custody of her grandchildren.  She was also suffering from migraine headaches and insomnia which aggravated her psychological condition.  He was unable to determine how long her disability would last because she was not engaged in appropriate treatment.  Her doctors estimated the duration of her disability to be several months, but he questioned this estimate unless she was treated at least on a weekly basis by a psychotherapist. (Ds MSJ, SOF, Ex. 9: Physician Consultant Review (PCR)).

Based on IPC Shallcross' review, MetLife approved benefits from October 21, 2004 through December 22, 2004 and January 20, 2005.  When Plaintiff appealed the termination date, MetLife gathered  medical records from her treating therapist and family physician and referred her claim file to an independent physician consultant (IPC), Dr. Bailey, M.D., Board Certified in Internal Medicine.  Based on his review of the medical records and personal discussions with Dr. Rouzaud, he answered five questions for MetLife.  (Ds MSJ, SOF, Ex. 22:PCR.)

He was asked to discuss the clinically observed or evaluated physical function impairments he documented or identified and to say whether there was severity of functional limitation or impairment of her daily activities as well as treatment and response to date.  He was asked to identify specific impairments that prevented her from performing her job beyond 4/1/2005, which could be substantiated by current documentation in the file including testing, results, treatment and the M.D. to M.D. teleconference. *Id.* at 399.

15

On March 25, 2005, after conferencing with Dr. Rouzaud, he responded: "Severe migraine headaches which the claimant [had] been having daily, almost continuously and in addition she had been treated with IM shots of Demerol and Phenergan, and then switched to oral narcotic medications.  The AP[7] [had] also noted increased fatigue, daytime drowsiness and confusion.  She additionally in the note for 12/10/2004 noted that the claimant had a near accident secondary to the above.  Some of the above, of course, could be caused by the strong medications that the claimant was taking for the headaches."  AP had noted she was impaired by: "fatigue, constant headache, lack of concentration and daytime drowsiness."  *Id.*

He described Plaintiff's treatment as appropriate in that it was multidisciplinary with both counseling and treatment of her headache and also symptoms of anxiety.  He referred to Dr. Shallcross' psychological IPC in December, which found she was not receiving appropriate care, and described this was no longer the case.  According to his telephone conversation with Dr. Rouzaud, the claimant appeared to be making improvement with a new therapist and the medication she was on.  In his estimation, treatment included a focus on her returning to work.  Dr. Rouzaud told him that Plaintiff's husband had just recently died and that Dr. Rouzaud hoped in some way this might improve the Plaintiff's condition.  Dr. Rouzaud hoped that she might be able to return to work within 2-3 weeks.  Dr. Bailey estimated it might be 3-4 weeks.  *Id.* at 339-340.  Accordingly, MetLife found the Plaintiff was unable to perform the essential functions and duties of her job as a production technician through April 17, 2005.  *Id.* at Ex. 25: 4/4/05 Notice.

On April 7, 2005, Dr. Bailey answered follow-up questions from MetLife.  MetLife asked: "Is the treatment appropriate, workup, followup, treatment by a medical specialist appropriate for the diagnosis of migraine headaches and is there fairly

[7]Attending Physician.

16

documented severity of impairment precluding her from functioning in the workplace as well as in the home environment?"  *Id.* at Ex. 26: PCR.

He responded that there was not an exhaustive workup for migraines, but per his conversation with Dr. Rouzaud, there seemed to have been involvement with a neurologist at some point and also an MRI.  He questioned that these tests may have primarily been in response to her cerebrovasculare event (stroke), but stated he would be "loathe" to question the diagnosis if she had actually seen a neurologist and had the MRI. He criticized Dr. Rouzaud's evaluation, saying "it could have been more extensive," but found that it was "quite possible [] in the realm of clinical judgment by the treating physician, no more testing needed to be done."  *Id.*  In his earlier report, Dr. Bailey had recorded that Dr. Rouzaud explained the Plaintiff's history of stroke required treatment with more debilitating narcotic medication for Plaintiff's migraines.  *Id.* at 399. Nevertheless, he concluded that there was no "objective evidence on a physical basis that would necessitate [her] from being out of work past 04/01/2005." *Id.* at 208.[8]

Plaintiff appealed the April 17, 2005, termination date, and on June 29, 2005, MetLife referred her file for appellate review to new IPCs, Dr. Cowel, an Internal Medicine doctor, and Dr. Robert N. Polsky, a psychiatrist.  MetLife's denial in July was based on these doctors' findings that there was no medical support for her claims.  Like earlier IPCs, both of these doctors reviewed her records and conducted peer-to-peer conferences with her treating physicians, Dr. Rouzaud and Dr. David.  Unlike earlier IPCs, MetLife asked Drs. Cowel and Polsky to determine whether the medical evidence supported her alleged condition, "outside of subjective employee reports." *See* (AR at 363, 367 (IME/PFR Cowel and Polsky), *compare* AR at 398, 642 (IME/PFR Shallcross and Bailey).

---

[8]The Court notes that on March 25, 2005, Dr. Rouzaud provided an Attending Physicians's Statement of Disability which specifically provided "objective findings" for migraines as: "photophobia, guarding ROM of head, neck."  (AR at 422.)

According to Dr. Cowel, Dr. Rouzaud described the Plaintiff as having tension headaches, but Dr. David described them as migraines.[9]  Dr. Rouzaud did not believe that from a physical perspective the Plaintiff's condition was of a severity that would preclude her from returning to work.  Dr. Cowel's opinion was sent to Dr. Rouzaud for comment, but she provided none.[10]  The Court notes that Dr. Cowel's summation of Dr. Rouzaud's opinion is contrary to her records, which reflect that at all times she had been treating the Plaintiff for migraines.  *See* (AR at 652-655 (October Certification of Physician or Practitioner: "Patient overly stressed/depressed/secondary anxiety, insomnia, problems focusing/concentrating, with sleep deprivation, up fatigue, migraines as well."); AR at 656 (November Certification of Physician or Practitioner: plaintiff unable to work due to "insomnia, fatigue, irritability, difficulty thinking and concentrating memory disturbances, increased migraine headaches"); AR at 340 (12/4/04 Notes describing depressed mood as aggravating migraines); AR at 285 (12/20/04 Notes describing sleep deprivation aggravating migraines); AR at 338 (1/20/05 Notes describing depression and headaches); AR at 342 (2/5/05 describing continuous migraines; AR at 421 (3/25/05 Notes  describing migraines)).

Dr. Cowel ignored the IPC review by Dr. Bailey in March, which found Dr. Rouzaud was treating Plaintiff for "severe" migraine headaches, which the claimant was having "daily, almost continuously," and Plaintiff was being treated with "IM shots of Demerol and Phenergan," and then switched to oral "narcotic medications."   Given this record, the Court questions Dr. Cowel's representation that Dr. Rouzaud only described the Plaintiff as suffering from headaches that would not interfere with her ability to work, but defers to his representation that Dr. Rouzaud considered Plaintiff's migraines to be

---

[9]The reverse was true: Dr. David reported that she complained of migraines, which he described as sounding more like tension headaches.  (Ds MSJ, SOF at 40; AR at 158-159.)

[10]The Court notes that Dr. Rouzaud had detailed discussions of the Plaintiff's case with MetLife's IPCs in December, March and June.

secondary to her depression and anxiety.[11]  It appears that by July, Dr. Rouzaud was

deferring to Plaintiff's psychiatrist regarding Plaintiff's ability to return to work.

Dr. Polsky was the IPC that MetLife turned to for its psychiatric assessment.  He

reviewed Dr. David's records and conducted a peer-to-peer conference with him.  Dr.

Polsky found that "the medical data did not clearly support the severity of psychiatric

conditions other than subjective self-reports."  (Ds. MSJ, SOF, Ex. 41: July 27, 2005

Notice.)  Dr. Polsky's report was sent to Dr. David, who unlike Dr. Rouzaud, responded

that he "strongly" disagreed with Dr. Polsky's conclusion that the Plaintiff was

functioning at her baseline.  Dr. David, who had been treating the Plaintiff every two

weeks since February, said that she had "significantly decompensated under the stress of

her husband's terminal illness and death, and under the pressure of trying to care for her

grandchildren."  He explained, "In addition to the usual symptoms seen with severe grief

and depression such as tearfulness, decreased energy and insomnia, she has become

disorganized with significant deficits in concentration and memory.  She cannot get her

bills paid.  She cannot keep on top of paper work such as her disability requirements.  She

gets lost going to simple doctors appointments.  She misplaces things and cannot read.

This state is much different than her level of functioning prior to this period of disability."

He concluded, "At this time she definitely would not be able to perform in her role of

technician at Raytheon."  (AR at 450.)

_____

[11]It appears that the Plaintiff saw Dr. Rouzaud around June of 2005, and Dr. Rouzaud
ordered x-rays of her spine because she was having back pain.  At that time Dr. Rouzaud
described Plaintiff as having problems with sleep, memory, concentration, migraine– all
related to grief.  (AR at 406) (date is obscured on record).  The Court defers to Dr. Cowel's
conclusion that Dr Rouzaud did not believe Plaintiff's back pain prevented her from
physically performing her job, which was designated light exertion.  The Court notes,
however, that Defendants failed to consider the combined debilitating effect of her migraines,
back pain, and depression.

In September, Dr. Polsky filed a supplement to his opinion after reviewing Dr. David's response and after reviewing a medical opinion from Dr. Haas, Raytheon's on-site clinic physician. In addition to seeing her own treating physicians, Plaintiff's condition was also followed by Raytheon's on-site medical staff, and Dr. Haas examined her in August after the Plaintiff failed to return to work.

The Raytheon clinic's progress notes correspond to Dr. David's reports. (AR at 484-488.) The Raytheon clinic notes reflect the same self-reports by Plaintiff that she could not manage her grandchildren or household responsibilities, she was yelling and screaming, she was crying and talking to her dead husband. *Id.* at 487-489. Like Dr. David, Raytheon's medical staff also reported that they observed her crying and sounding frightened with jerky breaths making her anxiety audible in her voice, being confused, and being heavily sedated because of migraines. *Id.* at 487.

Dr. Haas assessed the Plaintiff as suffering from depression, grief reaction, significant psychosocial issues. She wrote: "It is unclear in this interview whether the employee is actually capable of returning to work at this time. She was unable to come to the interview alone. She describes being reluctant to leave her home, even to visit her widowed mother. She describes being unable to sleep without interruption, and for brief intervals. These problems would indicate her condition has not improved. It remains a concern whether she can resume the work of an Inspector, requiring sustained ability to concentrate, ability to interact with her supervisor and co-workers, ability to follow detailed drawings and refer to specifications, as well as to identify possible flaws in the assembly before it goes out the door." *Id.* at 484.

MetLife sent Dr. Haas' records and Dr. David's letter of objection to Dr. Polsky. MetLife instructed Dr. Polsky: "the focus has to be on employee's condition and functionality as of 4/18/05." *Id.* at 489. Dr. Polsky rejected Dr. David's finding that Plaintiff's condition had worsened since her husband's death because he did not "include

any mental status examination finding to corroborate these." *Id.* at 185.  He described Dr. Haas' opinion as also based on Plaintiff's self-reporting; unsupported by mental status or mini-mental status examination, and that "Dr. Haas was only able to extrapolate Plaintiff's functionality as of 4/18/05." *Id.* at 186.  Dr. Polsky did not change his previous determination that the Plaintiff failed to demonstrate she was unable to perform all of the duties of her job as of 4/18/05.  *Id.*  On November 25, 2005, MetLife affirmed its April 18, 2005 termination of benefits.  *Id.* at 69-70.

Conclusion

The Court has reviewed the Plaintiff's medical record and finds there is not substantial evidence to support MetLife's denial of benefits.  Plaintiff's medical record is accurately summarized by her in her Motion for Summary Judgment at pages 3 through 12.  There is not one scintilla[12] of evidence to support Dr. Polsky's conclusion that she was functioning at her baseline as of April 18, 2005, and could perform the essential functions of her job.  The medical evidence is to the contrary.  By all accounts, except Dr. Polsky, Plaintiff's condition deteriorated after the death of her husband in March.

Dr. Polsky was correct that there were no objective clinical tests to support her claim.  There had never been any such evidence and MetLife had three times found adequate medical evidence to establish that her functional limitations were continuing.  It is undisputed that MetLife had the right to require diagnostic testing, but it did not.  If it had ordered such testing it may have had medical evidence to support Dr. Polsky's conclusion that she was capable of performing her job.  Without it, the medical evidence remained what it was – adequate to establish Plaintiff's continued disability due to functional inability to perform her job as of April 18, 2005.

[12]Dr. Polsky misrepresented Plaintiff's caring for her grandchildren and driving as evidence of her functionality in performing daily activities because the evidence reflects that she was not capable of driving herself to her doctor appointments and caring for her grandchildren was a primary stressor causing her depression and anxiety.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Accordingly,**

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (document 31) is GRANTED; Defendants' Motion for Summary Judgement (document 29) is DENIED.

**IT IS FURTHER ORDERED** that within 20 days of the filing date of this Order, the Plaintiff shall provide a form of Judgment to be entered in this case.  Defendant shall have 10 days to file any objection to the form of Judgment.  There shall be no Reply.  The Court shall enter Judgment accordingly.

DATED this 16th day of December, 2008.

David C. Bury
United States District Judge